# Exhibit G

```
 1                      UNITED STATES DISTRICT COURT

 2                      EASTERN DISTRICT OF NEW YORK

 3      FELICIANO ET AL.,          .    Docket No.
                                    .    1:25-cv-01929-RER-LKE
 4           Plaintiffs,            .
                                    .
 5              v.                  .    Brooklyn, New York
                                    .    Thursday, August 14, 2025
 6      JPJ FRANKLIN LLC ET         .
        AL.,                        .
 7                                  .
             Defendants.            .
 8      . . . . . . . . . . . . .   .

 9              TRANSCRIPT OF PRE MOTION CONFERENCE
           BEFORE THE HONORABLE RAMON E. REYES, JR.
10                UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the Plaintiffs:        Kessler Matura P.C.
                                  GARRETT D. KASKE, ESQ.
13                                534 Broadhollow Road
                                  Suite 275
14                                Melville, New York  11747
                                  631-499-9100
15
                                  Werman Salas P.C.
16                                SALLY JASMINE ABRAHAMSON, ESQ.
                                  609 H Street Northeast
17                                4th Floor
                                  Washington, D.C.  20002
18                                202-830-2016

19    For the Defendants:        Sage Legal LLC
                                  EMANUEL KATAEV, ESQ.
20                                18211 Jamaica Avenue
                                  Jamaica, New York  11423
21                                718-412-2421

22    Transcription Service:     Superior Reporting Services LLC
                                  P.O. Box 5032
23                                Maryville, TN 37802
                                  865-344-3150
24
      Proceedings recorded by electronic sound recording;
25    transcript produced by transcription service.
```

Superior Reporting Services LLC
P.O. Box 5032 Maryville, TN 37802
transcripts@superiorreporter.com

P R O C E E D I N G S

THE CLERK:  Civil cause for pre-motion conference in 25-cv-1929, Feliciano, et al. versus JPJ Franklin, LLC, et al., before the Honorable Ramon E. Reyes, United States District Judge, presiding.

Counsel for Plaintiffs, please state your name.

MR. KASKE:  Good morning, Your Honor.  This is Garrett Kaske from the law firm of Kessler Matura, for Plaintiff.

THE COURT:  Good morning.

MS. ABRAHAMSON:  Good morning.  Sally Abrahamson from Werman Salas, also on behalf of Plaintiffs.

THE COURT:  Good morning.

And counsel for Defendants.

MR. KATAEV:  Emanuel Kataev of Sage Legal LLC for the Defendants.  Good morning, Your Honor.

THE COURT:  Good morning.

This is Defendants' proposed motion, so why don't you tell me about it, Mr. Kataev?

MR. KATAEV:  Yes, Your Honor.  The Fair Labor Standards Act provides that employer shall pay to each of his employees not less than the minimum wage, and it does not specify when it must be paid.  It only requires that the wages be paid in a timely fashion.  The complaint alleges here that they were paid weekly, but meekly suggests, through

1  inference and innuendo that somehow the checks were held,
2  that they were paid a week later than originally intended.
3  This makes no sense for a lot of reasons.
4            THE COURT:  Why doesn't it make any sense?
5            MR. KATAEV:  For one thing, Your Honor --
6            THE COURT:  The employer gets to hold onto the
7  money for an extra week and earn whatever meager interest
8  they're paying these days on bank accounts.
9            MR. KATAEV:  Your Honor, this is not a
10 sophisticated (indiscernible) who's earning interest on his
11 bank account.  Courts are permitted to read complaint
12 allegations and utilize common sense.  The reason why
13 biweekly payroll is done is to save money on the printing and
14 labor involved in printing paychecks.  It's a cost-savings
15 measure for payroll costs in the sense that you'd pay a
16 payroll company to print those checks.  It makes absolutely
17 no sense to print weekly checks but hold onto the money.  And
18 I just don't --
19           THE COURT:  I don't know that I agree with that.
20 But there are also manual laborers, and the labor law
21 requires them to be paid weekly.
22           MR. KATAEV:  Correct. No disagreement there.  My
23 point is --
24           THE COURT:  So if we take supplemental jurisdiction
25 over this, over the labor law claims, you've got a problem.

1  Your client has a problem.

2             MR. KATAEV:  I disagree.  I don't think there's a

3  problem.  The complaint doesn't say that the employer failed

4  to pay them on a weekly basis.  The complaint suggests that

5  the employer may have held onto these checks even though

6  they're printed weekly.  It makes no sense to me.  I don't

7  think there's enough there.  I think they need more in there

8  to show that --

9             THE COURT:  This is a motion to dismiss.

10            MR. KATAEV:  For failure to state a claim.

11 Correct.

12            THE COURT:  Right.  So the allegations in the

13 complaint are deemed to be true.  And if they're making that

14 allegation that although the checks were dated weekly, they

15 weren't given weekly, they were given biweekly, we're stuck

16 with that, and that states at the very least a valid labor

17 law claim.

18            MR. KATAEV:  I'm not sure.  The complaint says

19 that, "Despite purporting to issue weekly paychecks,

20 Defendants withheld every other weekly paycheck for an extra

21 week, and as a result, they only provided paychecks on a

22 biweekly basis."  First and foremost, that generalized

23 allegations isn't sufficient.  The Fair Labor Standards Act

24 requires that the Plaintiff provide an example of at least

25 one week in which they were not properly paid.  These kind of

1  generalized allegations have been rejected repeatedly by the
2  Second Circuit in the trilogy of cases of Dejesus, Nakahata,
3  and Lundy.
4           I recently, a few years ago, prevailed in the
5  Second Circuit after obtaining a dismissal for a similar
6  claim, for overtime, not for not paying timely, where there
7  were similar generalized allegations --
8           THE COURT:  The Lundy line of cases concern
9  the -- if I'm remembering it correctly, the number of hours
10 worked in a pay period, not a pay frequency argument.  And
11 even aside from that, the specific allegations here, you
12 know, they don't have to say, "On June 1st, I was given both
13 checks for, you know, May whatever week and the June week."
14 You know, it doesn't have to be that specific.  I mean, we
15 have allegations from both of the Plaintiffs on when they
16 were working, the period of employment, and "I didn't get
17 weekly checks.  I got them every other week, two checks."  I
18 see that as being fine.
19          MR. KATAEV:  I don't know.  I'm looking at
20 paragraph 35 and paragraph 18.  Mirror images of each other.
21 One for each Plaintiff.  "Defendants prepared" --
22          THE COURT:  Hold on just one second.  35 and 18.  I
23 want to pull that up.
24          Yeah.  35 and 18, you said?
25          MR. KATAEV:  Yes, Your Honor.  "Defendants prepared

1  Plaintiffs' checks on a weekly basis, but only provided the
2  paychecks to the Plaintiff on a biweekly basis.  As a result,
3  they failed to pay every week."
4           There are so many issues with this.  Even accepting
5  these allegations as true, they don't provide sufficient
6  detail to really hone in on the fact that they failed to pay
7  every week.  This is a conclusory statement.  They have to
8  provide more information.  They have to state, you know, at
9  least one example based on Lundy, Nakahata, and Dejesus.
10          THE COURT:  What case stands for that proposition
11 that they have to give one specific example of the frequency
12 of pay?
13          MR. KATAEV:  There is no case like that, but I'm
14 arguing by analogy, Your Honor, this is insufficient because
15 it's not clear.  You know, what about direct deposit?  Did
16 they reject direct deposit?  You know, were they receiving --
17          THE COURT:  Okay.  You're asking for far too much
18 specificity.  The federal courts are on notice pleading.
19 This is -- I consider it to be ample notice of a pay
20 frequency claim.  They weren't paid every week.  They were
21 paid every other week during their period of employment.
22 That's enough.  Discovery can reveal the specifics.  Yeah.
23          So why don't you tell me about the rest of your
24 motion?
25          MR. KATAEV:  My other aspect of my motion is that

1  there is -- the Court should exercise its discretion against
2  making supplemental jurisdiction over the Fair Workweek Law
3  claims.  The frequency of pay issue is completely separate
4  and apart from how they were scheduled to work.  There is no
5  common nucleus of operative facts there.  Their receiving
6  their schedules has nothing to do with when they are paid.
7  It's a completely separate claim.
8           There are no overlapping facts at all with respect
9  to that.  This piggybacking is inappropriate.  There's no
10 federal claims that it's tied to.  And based on that, those
11 claims should drop too, without prejudice.  Which to pursue
12 it in state court, they're welcome to do so.  I'm not even
13 sure they can do it in state court.
14          THE COURT:  Mr. Kaske, you want to respond to that?
15          MR. KASKE:  Yeah.  I would say, Your Honor, that
16 this situation is very different than those I know the Court
17 has dealt with in the past, where someone brings, for
18 example, a discrimination claim and a wage-an-hour claim
19 together.  And although there may be some same actors
20 involved in the underlying baseline of the fact that, you
21 know, it's the same workplace, the incidents that led to the
22 violations are completely different.
23          This is a situation where the heart of a late
24 payment claim is that folks were scheduled to work, did work,
25 and then were not paid on time, okay?  Which involves

1  discovery and information from managers, from the payroll
2  system, and from the scheduling processes that they use.
3         The related issue is that the Fair Workweek claims
4  revolve -- the front half of the Fair Labor Standards Act
5  case, right, of the fact that folks were scheduled to work
6  certain shifts, when were they scheduled?, and did they work
7  those shifts?  And if so, what were they paid?  Which then
8  brings us into the payroll portion of the Fair Labor
9  Standards Act case.
10         So this is one in which it's not just the
11  employment relationship that Plaintiffs are claiming
12  constitutes the operative facts, right, the common nucleus of
13  operative facts, but rather it's the entire payroll process
14  that is at issue in both claims.  When were people working?
15  When were they told they worked?  Did they work those shifts?
16  And what were they paid?
17         THE COURT:  Mr. Kataev, is there anything else you
18  want to raise about your motion?
19         MR. KATAEV:  Yes.  Although I understand the
20  Court's position on it, I do still wish to proceed with the
21  motion.  That's the first part.  As to the second part, I
22  think Counsel's description of the flow of the claims, you
23  know, we start with the frequency, we start with when they
24  were scheduled, and then we move into when they were paid,
25  demonstrates that there's no common nucleus of operative

1  facts, because there's one issue and then there's another
2  issue.  And because of that, the Court should not exercise
3  supplemental jurisdiction --
4             THE COURT:  Okay.  Let me ask you a question, Mr.
5  Kaske.  I was looking at the complaint before we got on the
6  call.
7             MR. KASKE:  Yes, Your Honor.
8             THE COURT:  And I noticed the collective
9  allegations in the class -- not the allegations.  The
10 definition of the collective and the class and the Rule 23
11 class, and it's pretty broad.  I'm wondering about, like,
12 what happened?  Where did these two Plaintiffs work,
13 physically?  Was it the same Checkers --
14            MR. KASKE:  Yeah.
15            THE COURT:  -- location or two different ones?
16            MR. KASKE:  So the two Plaintiffs worked at two
17 different Checkers locations.  We've named three Checkers
18 locations that are all commonly owned by -- that are all
19 located in New York City that are all owned by the same
20 individual.  We made allegations in the complaint as well
21 about some of the interrelated management processes here,
22 just, you know, to demonstrate to the Court that there are
23 common connections, in addition to the policies, but also to,
24 like, management and such for the three related entities.
25 You know, the complaint isn't going after all Checkers in the

```
 1   state.  It's just these three that are held by this specific
 2   franchise owner.  Franchisee.
 3           THE COURT:  You have no Plaintiff that worked in
 4   the third location?
 5           MR. KASKE:  Correct.
 6           THE COURT:  What evidence do you have that that
 7   third location had the same pay practice?
 8           MR. KASKE:  In the complaint, we don't have any,
 9   you know, direct evidence from a Plaintiff related to that.
10   In our own investigation, we feel confident that, through
11   discovery, we'll be able to show that there were the same
12   practices going on at that other location.  But specifically
13   in allegations in the complaint for which you can take an
14   inference that there are common policies across all three
15   entities, and the fact that, you know, we've named two of
16   three that were all owned by the same individuals.  I would
17   direct the Court to the allegations starting in 59 and
18   running through 75.
19           And you know, some of the, I think, key facts there
20   are that Mr. Josan (ph.) was a member of all three
21   Defendants.  He's an owner of each Defendant.  You know, he
22   holds himself out to be the owner of each Defendant.  He has
23   franchise agreements with Checkers, you know, big Checkers.
24   With regards to these Defendants as well that employees were
25   transferred between the Defendant locations, the three at
```

1  issue and that they share a common operations manager, who
2  was hired by Mr. Josan as well.  And Mr. Josan visits all the
3  stores.
4           I think from those allegations, I think it's easy
5  to make an inference that the entity at which we do currently
6  have a named Plaintiff working there in the complaint, that
7  they were working under the same payroll and scheduling
8  practices.
9           MR. KATAEV:  Your Honor, can I be heard?
10          THE COURT:  All right.  Well, we're not at the
11 collective certification stage or the class stage, and who
12 knows if we will actually get there?  But I think to certify
13 a collective you need -- or a class, you would need more than
14 an inference.  You would need evidence of a pay practice and
15 sort of the scheduling to get those certified.
16          MR. KASKE:  Correct, Your Honor.
17          THE COURT:  All right.  Under my rules, my
18 individual practice rules, I reserve the right to deem
19 motions as having been made on the pre-motion letters, and I
20 will do that here.  I'm going to deem the motion to dismiss
21 as having been made, and I'm going to deny it.  I think the
22 allegations in the complaint are sufficient to raise a pay
23 frequency claim.  And frankly, it would be inefficient to
24 dismiss the --
25          MR. KATAEV:  Fair Workweek.

| | |
|---|---|
| 1 | THE COURT:  -- Fair Workweek claims just to send |
| 2 | you to state court where you would be likely engaging in a |
| 3 | lot of the same discovery.  So I will exercise supplemental |
| 4 | jurisdiction over the Fair Workweek claims. |
| 5 | You folks have not yet met with Magistrate Judge |
| 6 | Eshkenazi, or have you? |
| 7 | MR. KATAEV:  We have not. |
| 8 | MR. KASKE:  We have not, Your Honor. |
| 9 | THE COURT:  Okay.  I'm going to ask her to convene |
| 10 | an initial conference with you.  I would like you to |
| 11 | seriously consider consenting to her jurisdiction for all |
| 12 | purposes.  She's a great magistrate judge and I'm sure she |
| 13 | will handle you very well.  And also, whether you consent to |
| 14 | her jurisdiction or not, you should seriously consider trying |
| 15 | to resolve this, short of full-blown litigation. |
| 16 | Have there been any discussions about that? |
| 17 | MR. KATAEV:  We've had preliminary discussions, but |
| 18 | regrettably, the only discussion Plaintiffs were willing to |
| 19 | have were on the class and collective action-wide basis.  One |
| 20 | of the Plaintiffs worked for a few months in '23.  The other |
| 21 | one worked for a few months in '21.  Client's not prepared to |
| 22 | do that. |
| 23 | I would, however, request that the Court consider |
| 24 | issuing a mediation referral order to give it the good old |
| 25 | college try, because my clients may be willing to not |

1  necessarily agree to a class or collective action-wide
2  settlement, but maybe do a settlement that will make the two
3  Plaintiffs and their attorneys happy enough to do away with
4  that, and would encourage.
5            THE COURT:  Mr. Kaske, do you want to respond to
6  that?
7            MR. KASKE:  Yeah.  To just confirm that we had
8  preliminary discussions before filing the lawsuit, given what
9  we were seeking to resolve it and the toll we were looking
10 for and such, conversations broke down and we filed and now
11 here we are.  I think we're happy to review potential
12 mediation, but I would suggest that we do that with the
13 magistrate's guidance to work into the magistrate's schedule.
14           THE COURT:  All right.  I will leave that to Judge
15 Eshkenazi.  I think it's probably a good idea to seriously
16 consider that, whether you mediate on an individual basis or
17 a class-wide basis.
18           I mean, really, if we're talking about the pay
19 frequency claim, didn't the legislature sort of severely
20 limit the damages that Plaintiffs can get for those claims?
21           MR. KASKE:  Yes.  They did.  Sixteen percent
22 interest for the duration of the delay.
23           THE COURT:  Which someone who's making minimum
24 wage --
25           MR. KASKE:  It's pennies on the dollar.  Yeah.

14

```
 1              THE COURT:  Yeah.  So even if you were to settle on
 2   a class-wide basis, really not going to break the bank.  I
 3   don't know how big these locations are, but you know -- or
 4   how many employees they have.  So whether you mediate on the
 5   class-wide basis or an individual basis, it's not going to be
 6   great recovery, I wouldn't think.  But talk to Judge
 7   Eshkenazi about that.  I'm sure she'll pull you in very
 8   quickly, so be prepared for a scheduling order.
 9              MR. KASKE:  Great.  Thank you.
10              THE COURT:  All right?  Okay.  Anything else?
11              MR. KASKE:  Nothing from Plaintiffs.
12              MR. KATAEV:  Nothing for the Defendants.  Thank
13   you, Your Honor.
14              THE COURT:  All right.  Thank you folks.
15              MR. KASKE:  Thank you, Your Honor.  Thank you,
16   everybody.  Take care.
17         (Proceedings adjourned)
18
19
20
21
22
23
24
25
```

```
 1                    TRANSCRIBER'S CERTIFICATE

 2          I certify that the foregoing is a correct

 3   transcript from the electronic sound recording of the

 4   proceedings in the above-entitled matter.

 5

 6   Laura Hunt                              August 18, 2025

 7

 8   _____      _____

 9   Laura Hunt                              DATE

10   Legal Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Superior Reporting Services LLC
P.O. Box 5032 Maryville, TN 37802
transcripts@superiorreporter.com